of this morning, In Re ICL Holding Company Inc, number 14-2709. Commissioners Clark and Clark, first time ever. My brother. So to speak. I have some notes. Brother from another mother. May it please the court, Thomas Clark on behalf of the United States. I'd like to reserve three minutes of rebuttal. No problem at all. Let me see if I can just run by you my perception of what a decision tree would be in this case and see if you agree and then ultimately Mr. Clark can comment, the other Mr. Clark can comment on that as well. Number one, whether the government's claim here is moot. They're claiming that it's one side saying it's moot under 363M. So is it statutorily moot? Mr. Clark, Tony Clark has said in his brief that it's also constitutionally moot. There's only a couple pages on that. And then the committee says it's also equitably moot. So there's three mootness possible claims. So is it moot? Secondly, if it's not moot, whether the escrow monies, which at one point were up to an aggregate, I guess, $1.8 million roughly, and the monies given to the unsecured pursuant to a settlement, which is $3.5 million if I recall, whether those are property of the debtors of state under Section 541. The third issue would be if either one of them is property of the debtors of state, whether the absolute priority rule that relates to plans under 1129B2B2 would apply to Section 363 sales. So does the absolute priority rule that applies to plans apply to sales? And then I guess finally, if the absolute priority rule applies to sales, were these, people call them, were these, quote, gifts, close quote, that were violative of the Bankruptcy Code? Is that the right way to go about analyzing what's before us? I think that's precisely the right way to go about it, Your Honor. And that's exactly the way that I was intending to proceed. Pick up whichever one of those you want. Okay, first of all, the cases are not moot. Constitutional mootness, I think, forget about that. The constitutional mootness argument is basically that the Court can't give us any relief. Well, the Court agrees with our argument. Well, it can give us relief, and therefore, it's not constitutionally moot. We're harmed. We're asking the Court for relief, and the Court agrees with us. There's no constitutional mootness. And equitable mootness is also, I think, off the table. I think for the reasons we stated in our brief, this Court has an opinion from two years ago stating that, you know, because of 363M, equitable mootness does not come, equitable mootness applies to plans. It doesn't apply to 363B sales or 363F. I mean, there's some academic argument both ways on this, that one should apply, well, there's argument both ways. Okay. But as to the 363M argument, we think it's not moot. 363M contemplates that there will be appeals from 363B sales even if no stay is obtained. The operative effect of 363M is simply to limit the remedies that the Court can grant in the event of an appeal where the sale is not stayed. So, you know, the plain language of 363M says that the reversal or modification on an appeal of a sale that is not stayed shall not affect the validity of the sale. Well, the relief that we're seeking here does not affect the validity of a sale. I think this might come down to then how are you going to interpret the word sale in 363M. The bankruptcy code itself does not define the term sale. And in common parlance, a sale is simply a transaction between a seller and a buyer whereby the buyer agrees to purchase property from a buyer in return for a specified price. Now, the seller or the purchaser in this case is hospital acquisition. Hospital acquisition agreed to pay the consideration and got all the property that it had bargained for. Now, if the Court grants us the relief that we're seeking on this appeal, hospital acquisition is not harmed in any way. It gets to keep all the property that it purchased. I have a factual question maybe you could help me with. Could you tell me how much money is available that would satisfy the claim that you have? Well, we don't know exactly where the source of how much money is available. You know, I know that there was a payment of 3.5 million to the insecure creditors and there was a payment paid for administrative expenses. Yes, Your Honor. It's the money that went into the escrows for the payment of the professional fees and for the wind-down expenses, and then also the amounts that were paid under the settlement agreement with the insecure creditors committee. Now, just give me that. I've got the 3.5 million. Is that correct? Well, we don't know exactly how much was actually paid out because the debtors say in their brief that some of the amounts paid in the escrow funds was like $815,000 was returned to them. Well, if it was returned to them, then that's not part of the consideration. But in terms of priority, now, you don't have priority over insecure creditors, do you? We do. The administrative expenses get the top priority in bankruptcy, yes. The tough part I think that you have is you need to analyze, I think, these two items separately, the monies in the escrow and the monies pursuant to the settlement given to the insecurities. Are they property of the estate, which Judge Gross held that they weren't? Let's start with the easier one for you, the escrows. If there's roughly in the aggregate $1.8 million, I understand from the briefing that approximately $815,000 has been returned to the purchaser. And you note on page 11 of your reply brief that you're not making a claim to that as being proceeds of the sale any longer. So now we're down to $1.1 million that you want to share in. Is that correct? Well, again, I'm not sure of the exact amounts that were paid into the three different escrows. We'll just use those numbers for assumption purposes. I'm not saying you need to redo it. But it seems like you've now taken a substantial portion of the monies that were put in escrow for the debtor's counsel, the committee's counsel, and wind-down expenses and said, okay, $815,000 has been returned to the purchaser. And so now we're dealing with, whatever the number is, less roughly $815,000. Is that correct? That's correct, Your Honor, yes. So, okay, on my example, it's maybe $1.1 million. So even if you end up winning once we get through all of these issues, any victory here is pyrrhic, to say the least. Well, we would get some money, but there's a larger issue here because we're seeing this type of transaction happening more and more in bankruptcy. That's what I figured.  Why is the monies that remained as a general principle monies that can be distributed to you or property of the estate? The answer is? The answer, you start with the language of the statute, Section 541A6, says that proceeds of property of the estate are property of the estate, which we start there. We go to the asset purchase agreement on page 96 of the appendix. It says this is cash consideration. It defines that the consideration for what they're paying to get the assets is this cash. On page 98 of the appendix, actually two pages later on, it says, at the closing, the hospital acquisition shall pay to the debtors by wire transfer the amounts to be deposited into the escrow accounts. So that money was paid into the bankruptcy estate. It is proceeds of the estate, and therefore it is property of the estate, and the property of the estate has to be distributed. Now come to the tougher nut, which is the $3.5 million, because it looks like what happened is that the acquisition group, the former, the lenders here, which became the acquisition group, they took money out of their back pocket and settled up with the committee in order to have the committee withdraw its objection. Correct. How can that be property of the estate? Again, all I can say is for the same reasons that we stated in our brief, this is no different from any stocking horse bidder putting in a bid for property. If there's a rival bidder coming along, and instead of rival bidders, the unsecured creditors committee, and so if the stocking horse is going to prevail on its bid, it's going to have to up its offer. And that's what happened here. It had to up its offer in order to acquire these assets. But the monies here do not go through the estate like the escrow is set up to do. It's essentially saying, okay, I've agreed initially to pay out a credit bidding $320,000, and I'm adding at that time $1.8 million, so it's $321.8 million. And then somebody comes out of the woodwork and they object, and the committee has perhaps some good reasons, and they decide, the purchasers, okay, we're going to take cash out of our pocket, and we're just going to give it to them. I have trouble finding how that is property of the estate. Well, Your Honor, I acknowledge that that's a closer call than the other, but, you know, in our view, that is the amount that hospital acquisition had to pay to acquire these assets, and that's what they had to pay to acquire the assets. It, too, is proceeds of property of the estate, regardless of whether it actually physically ran through the estate like the monies in the escrow accounts did. And, you know, we also rely on the various cases, including this Court's decision, Armstrong World Industries, the second circuit of DVSD North America. Yeah, that's sort of now we're into the third issue. Now we're getting to the third issue, correct. Which is if there's the absolute priority rule that you must distribute, you know, with regard to securities, administrative, priority, securities, equity. Got it. But does that rule, which is in the code for plans of reorganization, which I understand there is no plan here. That's correct. And a lot of the cases have been dismissed so far, and I guess the remaining appear waiting to be dismissed after this case. Do you apply the absolute priority rule beyond plans to asset sales under Section 363? Well, we think it should be, Your Honor, and there are two different rationales to get there. Number one, for the reason we stated in our brief, we maintain that this is what the courts have called a sub rosa plan of reorganization. And sub rosa came from the Fifth Circuit's ratification. The response might be from the other Mr. Clark, there ain't no plan. There ain't no plan, but we maintain it is a de facto plan. When a debtor files for bankruptcy in Chapter 11, what is Chapter 11 all about? You file for Chapter 11 because you might have a secured creditor's debt coming due. You file the petition. You hold off the creditor, and then you work out arrangements with your creditors. You devise a plan, and then you reorganize. Well, effectively, that's what happened here. They took care of all their debts. They paid their favored claimants. Their disfavored claimants are receiving nothing. And yet they cut off all voting rights, and they're reorganized. They have continued in business. I just want to ask you, and you might have answered, do the secured creditor's claims have not all been paid? Do they have any claims to any property that's considered property of the estate? The secured creditors? As far as the record, you can tell they haven't asserted any claims. But in any event, regardless, the cases say that whatever the secured creditor has in the estate, if it doesn't claim for itself, then it is subject to the distribution rules of bankruptcy. I'm just wondering if they still have any claims that would be prioritized over your claims and whether, in fact, you could not get anything out of the estate. Well, I think we can get something out of it because they put the money in the estate for distribution to other creditors. And once they relinquish that claim for other creditors, then we think we're entitled to a part of it. A final point I'd like to make. I don't think my time is up. If you have to go, you're fine. Even if you don't agree that this is a de facto plan of reorganization, which we think it is, I still think that at the end of the day it is more prudent to interpret Section 363B sales in a manner that does the least damage to the priority rules of the bankruptcy code. I mean, there you really have to rely on the Boyd, the 1913 case, and then the case, I guess, the 1939 case, because you really have to rely on Supreme Court cases more so than the code, I think, don't you? Well, yeah, I mean, we cited those cases in our brief, John, and we do agree with that. And, yeah, I think that's how 363B should be interpreted. Keep in mind, as I recall, and it's been a long time since I've read them, but don't they apply pretty much to every organization plan or the equivalent of one as it existed back then? I believe that's correct, Your Honor. Let me go to the final issue before you sit down. If the absolute priority rule does apply to Section 363 sales and these, quote, gifts, which are sort of the words that people use, do they violate the code? Would it be a fair test? I'll give you two parts, and I'll ask the other Mr. Clark the same thing, to say if there is a gift and the absolute priority rule applies, does it enhance the value of a reorganized business, which probably is not applicable to this case, that would apply to a plan? And, secondly, is it made on account of a substantial contribution to the estate by the transferee? In other words, in this case, was it made on account of a substantial contribution to the case by the professionals to the debtor, the professionals to the committee, and those who provide services for wind-down expenses? Would that be a fair test? I'm not sure I follow. In other words, if there is, if the absolute priority rule does apply, and therefore you need to take a look to whether there is a violation of the code, I'm trying to come up with a test that we could apply in the future. One of the prongs relates to a plan. That is, is there substantial value to a reorganized debtor? That probably is not relevant. That is not relevant here. The second is, was the monies that were paid, in this case to professionals primarily, on account of a substantial contribution to the estate by those professionals? Well, that comes down to how do you want to construe what contributions to the estate are? Well, I wouldn't do it. I wouldn't make the, I mean, the bankruptcy judge would have to do that. Because, and I'll say this, the record here shows that before bankruptcy, the debtors here conferred with their advisors, and they did a tax diligence study where they looked at various possible reorganization possibilities, and they determined that a sale transaction would result in an enormous tax liability. That's on page 273 of the appendix. It's a declaration of the former CEO. So they knew, as they were going into bankruptcy, that any sale transaction they did would result in an enormous tax liability. And so what they did here was they went into bankruptcy, did a sale transaction, and they did it in a way that avoided this enormous tax liability. Now, if you consider that to be a contribution to the estate, well, maybe there's an argument there, but from our point of view, that's not a contribution to the estate. You're looking at it, I mean, whether the IRS made a contribution to the estate. No, the IRS is owed an administrative claim. It's, I think, conceded, or has an administrative claim. Excuse me. That would be conceded. The question is, can the bankruptcy judge allow this type of, again, quote, gift, close quote, to, in effect, we call it carve out normally in bankruptcy, for professionals. I mean, the argument that, in hindsight, perhaps could be made for the debtors is, don't put this in the asset purchase agreement. Just have a credit bid for 320, and then on the side, do what you're doing with regard to the unsecured creditors when you pay them the 35. Just say, okay, I will put up monies from cash for me, the unsecured, or the purchasing group, to the professionals in order to allow this case to be completed. But wouldn't the professionals have to contribute anyway to the estate, and would it be any additional contribution than what they were already providing? Well, there's no doubt that the professionals contributed their services to the estate, but that gives rise to an administrative expense claim, which is every bit, it's on the same par as the administrative tax claim. It's no different. And all they did by setting things up in this way was they squeezed out the federal tax liability. But it's nothing, you know, it's not tax evasion. Why isn't it just smart lawyering? Well, we think that when Congress sat down and did the bankruptcy code, it did not contemplate that that tax liability could be squeezed out in this way. But it could fix it, couldn't it? I'm sorry? It could fix it, couldn't it? Well, it could fix it. But, again, I think that it's prudent for this court to interpret Section 363B as doing the least damage possible to the overall scheme of the bankruptcy code and what Congress was attempting to get at in Chapter 11. Okay. Thank you very much. We'll get you back in rebuttal. Good morning, your Honors. Tony Clark of Skadden Arabs for the Life Care Debtors as appellees. After listening to the court's questions, the hardest thing for me is to figure out where to start and where I'd like to start very briefly because I do want to address your questions both factual and legal. One is with the background and context of this case because, in this case, the context is important. The Life Care Debtors owned and operated 27 long-term acute care hospitals in 10 states. Now, basically, this one could be argued as a melting ice cube. Excuse me? One could be argued in bankruptcy terms as it's called a melting ice cube. This was definitely a melting ice cube, and it was melting fast, and it wasn't going to simply leave a puddle on the floor. When it melted, it was going to leave patients lying on the floor. So we have 4,500 employees, 1,400 beds, and in August of 2005, through no fault, obviously, of the debtors or anybody else, Hurricane Katrina hit, destroyed three of their hospitals down in the wilderness. And then regulations got changed, and things were – And they got no insurance to cover it. Things were acute in an acute care place. And just sort of at the 30,000-foot level, going to the equities of the situation here, after Hurricane Katrina, the debtors, their ability to rebuild – They lost three facilities. Is that correct? They lost three hospitals down there, and they were not insured. And their ability to rebuild was hampered by two things. Number one, a federal moratorium on new construction. And number two, federal – constant federal reductions in the Medicare reimbursement rates, which, given – We got this. It's the melt – The question then becomes here, is the other – Mr. Clark thought that the decision tree that I suggested is correct. Do you agree or disagree with that? You know, Your Honor, I conflated it into two, but I think it's really three. And the three issues would be mootness and the various – Well, it would actually be four. Number one would be mootness, three subsets of mootness. Yes. Second would be property estate for either of these two items that we're talking about, because they are separately analyzed. The third is, do you apply the absolute priority rule to Section 363 if you get by the second issue and the first issue? And then the fourth is, if you have this, quote, gifting, what would be a suggested test for a court to use to analyze in the future? Let me deal with number three first, because I think it's the easiest to deal with, Your Honor. There is absolutely nothing in the Bankruptcy Code, not in 1129, not in 363, and not in any other section of the Bankruptcy Code. I thought you were going to tell me the second issue was the easiest to deal with, at least as to the money that's given to the unsecured creditors. With respect to the issue of the absolute priority rule and whether it applies to 363, there's nothing in the Code that suggests that it would. And, in fact, the structure of the Code suggests just the opposite, because, as Your Honor knows, Section 360 asset sales can be affected on a stand-alone basis, as was done here, or in connection with a plan of reorganization. And when it is done in a plan, the Code makes it clear that not only do the plan requirements have to be satisfied, but also 363 requirements have to be satisfied. What cases go one way or the other, do you know of, that say that an absolute priority rule does apply to Section 363 sales or does not? I don't know of any cases that say it does. I found a lot of academic literature going both ways. I've seen articles on it. I don't know of any cases that say it does. Actually, I shouldn't say a lot. I found some. But I have seen cases, and frankly, at the top of my head, I can't give you the sites, but they are in our brief of cases that say that when you have a 363 sale, 363 applies and the absolute priority rules do not apply. I think there's a whole page of citations. And your argument would be that this is not Armstrong because Armstrong applied to a plan. That's exactly right. Armstrong was a plan. A plan where one class of creditors was to gift, if you will,  and the intervening unsecured creditor class didn't agree to that treatment. That is classic absolute priority rule under a plan. We didn't have a plan here. We didn't have a plan and we were never going to have a plan, and everybody understood that from the very get-go. Everybody, including the IRS, agreed that this sale transaction, which was transparent, in good faith, and indeed in the public interest, because without it, the debtors would have been liquidated, jobs would have been lost, hospitals would have been shuttered, and patients would have gone uncared for. So the IRS, in their brief, albeit in a footnote, but on page 43 of their opening brief, they acknowledged that it was necessary to keep the debtors' acute care facilities operating. It's easy to understand the context of the case because you really had to move quickly. If there's nobody that's coming out that's willing to put up more than 340 or something akin to it, I can understand why the lenders said, Hey, we've got to get a group together to do our stocking for us and act as quickly as humanly possible. But coming back to the issues that we were talking about, the only cases that I could find, at least in Delaware, relating to whether you apply or don't apply the absolute priority rule to sales, I found the NRA World Health Alternatives and OCS, which I think said no, and then TSIC, which is 08, I think, which said no, you don't. That's correct. Then there's some academic literature which says you should apply. What are the reasons that you should not apply? Let's just think this. You're writing the opinion for us to a 363. Why should the absolute priority rule not apply? You know what the argument against you will be. The argument will be that, hey, what's bankruptcy all about? It's about reorganization, and it's about distributing to creditors the assets of the estate, especially in a type of situation where you're not going to have a plan, or if you do have a plan, it's a liquidating plan. So that's their argument. Your argument against that is what? Let me suggest that it doesn't even matter in this case, Your Honor, whether theoretically one were to say absolute priority rules do or don't apply to a 363 sale. Why is that? Because on the facts on the ground here, the facts, as proved by overwhelming evidence, was that the prepetition secured debt without added interest, just the principal amount at the time of the bankruptcy fund was $355 million. The buyer, the secured lender subgroup, came in and credited $320 million. That was the only bid in a public auction that was received. Nobody was willing to bid. But they did set up this escrow, and they did consider it on page 96 of the Asset Purchase Agreement to be cash consideration. I'm not sure why they did that, but they did. They used those words to describe it, but there is absolutely no question under the Asset Purchase Agreement where the funds that had to go into the escrow were coming from. They weren't coming from the debtors. No, they were coming from the acquisition group, right? They were coming from the buyer. That's exactly right. Now, some people have assumed on this record that the actual cash that may have found its way into the escrow accounts and to the settlement originated with the debtors in the sense that the buyer was acquiring all the assets. It had a lien on all the assets, and that included the cash accounts that they had. And so they got the cash from the debtors in the sale and then used it to fund business. That is not necessarily so. Just to educate me, and I believe it's not in the record, why was there an agreement to set up three escrows? Because you could set up an escrow, for example, and you'd say, okay, Fuentes over there, you're the escrow agent. You are going to hold it. This is not property of the estate, and when the council presents to you bills or people for wind-down expenses, they present to you their bills. You can pay that out. But that's not what happened here. This is just the opposite. Actually, that is what happened, Your Honor. It wasn't Judge Fuentes. As far as I know, he's not in the escrow business. It was Citibank that was the escrow agent. I'd like to be. It is an easy way to make money, Your Honor. I can tell you that. What you've got here is this cash consideration. So it's pretty clear that that, for some reason, is being run through the estate. But the estate had no title to those assets, and it had no beneficial interest in those assets. It was simply an agent. 541 is pretty broad. I agree it's pretty broad, but it isn't inclusive of cash that the debtors have no interest in whatsoever. I think you have a very good argument on the $3.5 million. The tough argument you have is on the amounts that remain in the escrow. Well, let me just say, Your Honors, we're asking what are the facts with respect to what cash went in and how much it went. I can tell you that. I'm not sure it was ever in the record below because there was never a time when it needed to be. But the escrows that got funded were funded to the tune of approximately $10.7 million between the three escrows. It's not $1.8 million. You said it's not $1.8 million then? Well, let me get to that, Your Honor. It originally was $10.7 million for the three escrows, and then there was the $3.5 million for the settlement with the unsecured creditors. Today, what's left after payments out to the beneficiaries of those escrows, as well as the refund of $815,000 to the buyer out of one of the escrows that closed, there's approximately $2.5 million left, which is comprised of $1.5 million in the settlement fund for the unsecured creditors and roughly, and this is where, Your Honor, by your own math, roughly $1 million left in the wind-down escrow, which frankly is largely for the purpose of funding this appeal. Wait a minute. For the unsecureds, you had a $2 million and a $1.5 million. Are you saying that a portion of that $3.5 million went through the escrows? No. No, it did not. $2 million was paid directly to the adventure trustee for the unsecured notes and presumably distributed out to the note holders. The other $1.5 million? The other $1.5 million went into a, as I understand it, a settlement account that's controlled by the unsecured creditors council, I believe. Okay, so it didn't go into the estate. It did not. Nothing went into the estate, Your Honor. I think the estate, the seller as the debtor, was designated as the conduit through which the money was required to be paid into an escrow account for the benefit of specific non-debtor parties. What we would call the classic carve-out. Exactly. That's exactly what it was. It was a carve-out. And there was nothing wrong with that. And by the way, Your Honor raised the question of substantial contribution. Well, I'm just saying if you get to the fourth prong, is that a type of test that we can use for the future? In other words, let's assume that the absolute priority rule were to apply, whether it be a plan or a sale. Next case, let's say it's a plan. A plan is a two-pronged test. So monies are given out or somebody is, in effect, preferred over another. And then the question becomes, okay, the secure creditor says, I'm just doing this to try to get the deal done. Okay? Like SPM. In this case. And a lot of courts, like Armstrong is saying, no, you can't do it. DSPD says you can't do it in Second Circuit. So is it worth trying to come up with a rubric, a principle, a rule that says, okay, in the future, here's how you're supposed to look at this bankruptcy courts. One was the enhancement of the value of the reorganized business, if there is a reorganized business. And two, or two, it's made on account of a substantial contribution to the estate by the transferee, which in this case would be the professionals. That's exactly. The answer is, I don't think you should ever get to figuring out what the rule would be if the absolute priority rule were applied to 363, because it doesn't. I understand. But assuming it did. Assuming it did. Yeah. Yes, I think your honor's suggestion is a fine one. Take a look at what the purpose for the carve-out was. And I would suggest, add on to for both sides, there would be no presumption one way or the other. You know, I'm old-fashioned, and I say, look, all of this is the proceeds of the sale of the assets of the estate. And before it goes to escrows and various things, it's got to be submitted. It's got to be considered. It's got to be treated as the assets of the estate. And you can't just shoot it off anywhere. You've got to apply priorities. Well, your honor, what happened here was the priorities were applied. And how were they applied? All of the value went to the secured lenders, because the secured lenders had a lien on all of the assets, and the value of their claim exceeded the value of the assets by $35 million or more. So, for example, if you were to take up the invitation by my brother, Mr. Clark, to blue-pencil this agreement, and instead of having it the way it's currently structured, you say that, well, for some reason, these funds that went into the escrows and the funds that went into the settlement accounts have to be clawed back somehow from the people who already have it and then have to be paid into the estate. I don't know on what basis, because it didn't come out of the estate. It came out of the buyer's pocket. It was for the assets. Right. It got back into the debtor's estate. What then happens? The secured lenders never waived any claim whatsoever. They agreed to reduce their secured claim by $320 million as a result of their credit bid. They still have a secured deficiency claim of $35 million. Yeah, but Judge Roth is asking the same question that, in effect, the other Mr. Clark is asking. Once that's done and it becomes property of the estate or deemed to be property of the estate under 541, can the secured creditor designate to whom it goes, or must you follow a distribution scheme? And what I've said is it doesn't matter, because if you follow the distribution scheme, which people might think I should argue against, it goes to the secured creditor. And, in fact, I will tell you, the secured creditor is part of it because that's why we call it a carve-out. The secured creditor still has its $35 million secured claim. So cash comes back into the estate. I mean, that's easy for Mr. Clark to respond to that. We still have a $24 million administrative claim. It comes behind the secured claim. If it's any longer within the secured claim. It is covered by the secured claim. This is the same issue that you have in SPM. The question really becomes, do you apply Armstrong, which I can't change, the 2005 case, do you apply it when it applies to a plan, do you apply the absolute priority rule in that case to asset sales? And, Your Honor, I'm repeating myself, but as I say, it doesn't matter, because the secured lender had a lien, nobody ever challenged it, on all assets of the debtor. That would include any cash that the debtor had or comes to have. And until its $35 million claim is paid off in full, nothing goes to anybody else. Okay, you're saying it doesn't matter. But we're thinking about, I think the IRS is thinking about future cases, too. Freedom, and how are you going to, if the secured creditors don't have a claim which is going to cover all this. If you've got a situation where you don't have an undersecured secured lender, where there are cash proceeds that come into the estate from an asset sale, how do you deal with those? The answer is, you can deal with them in a plan, if there is a plan of reorganization, in which case Armstrong says you've got to absolutely follow the absolute priority rule, no question about it. But as a result of the 363 sale, if there is to be an application of some priority rule, whether it's the 1129B absolute priority scheme or some other priority scheme, you need to go to the Congress and get the Congress to tell you what that is. It's not in the Bankruptcy Code today, and it can't be read into the Bankruptcy Code. Well, it could be. You could argue it's read into by virtue of what the Supreme Court has said going back 102 years now. The Louisville Railroad case. Yes, I read the Louisville Railroad case, Your Honor, and the one thing I noted, it was a little arcane, it was a little difficult to follow, but the one thing I can tell you... Well, you've got to remember, the justices back then wrote their own opinions, so... And quite well, I must say. I wouldn't go with that one. Even if arcane. But the one thing I can tell you about that case is, because I read it, I read it two times, there's one word you won't find in that case anywhere. The word is bankruptcy. Because it wasn't dealing with the Bankruptcy Code, which didn't come into existence until 1978. It was dealing with railroads, which it said are peculiar creatures, and because of their peculiarity, sometimes unsecured creditors got priority over secured creditors. Yeah, but what happened there was the railroad reorganization concept was taken by Justice Douglas in 39, in a case I believe was called Case, and says, okay, this is how you do it. And I don't think anything in the code necessarily, the 78 Code, reverses that, at least on its face. Not on its face, but clearly nothing in the code. Also, there's nothing in the code that says, the absolute priority rule of 1129B applies to proceeds of a 363 sale where there has been and will be no plan of reorganization. Incidentally, Your Honor, on the facts, you are right. Most of, I'm going to say about 20 out of 30 of the debtor cases have been dismissed, and the remainder will be dismissed largely as a result of or once this appeal has been resolved. As I say, from the very beginning, everyone knew there would be no plan, because if you tried to do a plan, if you tried to apply the 1129 priority rules, everything would go to the secured lender. There would be nothing left for anyone else. And so in order to effectuate an asset sale that everybody acknowledges was in the public interest. I think that's picking up on what Judge Ross said. That's the disconnect here. Because, yes, it would. It would all go to the secured creditor, except when the secured creditor says, okay, I am now carving it out, slicing it out of my secured, the money that wrote to us, and I am gifting that or giving that. Giving. Gift is a noun. Give is the verb. Give. Giving that. End of bankruptcy, folks. We keep changing what nouns and verbs, Your Honor. I still insist on good English. She's right. I am giving that to the professionals. And the question the IRS is saying, wait a minute, you can't do that if the absolute priority rule applies, because we share in that. Not that we're going to share a whole heck of a lot today, but maybe tomorrow we do in another case. And I would take exception with the word gift, not on a grammatical basis, but on a substantive basis. The professionals didn't receive a gift here. The professionals came in and applied themselves diligently to effectuate a public interest transaction that everybody agrees should go forward. They were entitled to be paid for. That's why I proposed the test. And that's a good test to apply, certainly in this case. The professionals came in and cooperatively helped to effectuate a transaction. Eventually, the committee also agreed to cooperatively help and effectuate a transaction. And, frankly, because my question, it may be easy in your case that you can say, hey, look, here's what we've done, and somebody can say whether you've done the full amount of what you said you've done. But that's a different case. The problem is in a future case when you are bypassing a class and giving the money to unsecureds, if it went through the estate, or to equity, which often happens. Then the government is saying, hey, wait a minute, you can't do that. And so what we're trying to do is come up with something, if money goes to equity or to another group of unsecureds and it happens to go through the estate, did they make a substantial contribution? Or did they enhance the value of the organized entity if there's a plan? My suggestion, Your Honor, is that this isn't the case where you need to decide that. Partly it isn't. I think, frankly, it's a dead-on arrival. But if you are looking for a test to apply in those circumstances, then I think the test you suggest is a fine one to apply. Did the person receiving the funds, I'm not going to use your word gift, did the person receiving the funds, receiving the value, do something in the process to warrant getting that value from the secured lender or wherever it came from? And here clearly the answer to that is yes. The professionals, well, I could probably quibble a little bit. Some of that money went to the U.S. trustee for its fees. I'm not sure exactly what it did that helped the transaction. I'm not going to take the U.S. trustee on on this one. But the other professionals and the other what I refer to as lying down service providers did provide a service to get a transaction done that saved 4,500 jobs and that saved 27 acute care hospitals for their communities. And everybody, including my friend Mr. Clark, agrees that that was a good thing. Final factual question. So how much remains in the escrow for the payment of professionals? About a million dollars, Your Honor. Okay. Thank you. Thank you, Your Honors. The proceeds of the sale were property of the estate, and because they're property of the estate, we think 1129 applies. There was no plan, but Chapter 11 has no other. I don't think you can say 1129 applies because that applies to plans. Don't you have to say that the principle that's embedded in what the Supreme Court has done with the word absolute priority applies? Because Chapter 11 has no other provisions for the distribution of proceeds from a Chapter 11 estate, and that's why we think the court should apply it in this case, and that's why I think the absolute priority rule does apply. And as for the de-gifting doctrine that's been discussed here this morning, the Bankruptcy Code treats all administrative claims equally. The bankruptcy courts are not given the power to treat administrative claimants one by one and determine how much of a contribution this claimant made to the estate or that claimant. All administrative claimants under the Code are supposed to be treated equally. Now, you know, the secured creditors here were undersecured, but because we think this is a de facto plan, and even if it's not, 363B should be contributed to the least damage possible to the priority scheme in Chapter 11. There can certainly be a case where there is the comprehension of a plan, or the contemplating of a plan, but I'm not sure I'm seeing that a plan was ever contemplated here. I'm not sure that I can divine how a plan was actually contemplated here because it looks like everything's going to be dismissed and everybody's going to go their own way. No plan in compliance with the provisions of Chapter 11 was ever contemplated. They knew going in that they would not be able to do that, so they effectively reorganized. Well, that gets into another day's issue, which is bankruptcy code is often being used more so today far more than it was 30 years ago for 363 sales rather than reorganizations under Chapter 11. Correct, and we don't think that that's the proper way for the bankruptcy code to go. Well, in this case, I mean, they have a great argument that it is because the melting ice cube, it's hard to argue that this wasn't a melting ice cube. Well, yeah, and the government did not try to stay the sale because we recognize the realities of this case, but while we're claiming that… You did all you could. You tried to stay the distribution of proceeds before the bankruptcy court and before the district court. There's nothing else that I can think of you could have done. And we tried to stay the distribution of the funds because there was no pressing need to distribute the funds from the escrow accounts right away. And so, yes, the bottom line, I think, is that, yeah, the secure creditors here could have demanded to take everything that the debtors had, but they didn't do that. You know, they left something back in the estate, and as the Second Circuit said in DDSD, whatever the secure creditors here did not take remains in the estate for the benefit of the claim holders. And so, you know, my final point, Your Honor, if I could, is that I think the court should reach the same ground when it said that allowing this particular type of transfer would encourage parties to impermissibly sidestep the carefully crafted structure of the bankruptcy code, which I think is what happened in this case. Thank you very much. Thank you, both counsel, for very well-presented arguments. We'll take the matter under advice.